UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

AMGAD S. MIKHAIL,

                              Plaintiff (s),

        -against-

THE PROCTER & GAMBLE COMPANY,

                              Defendant (s),

-------------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL
DEMANDED**

    Plaintiff AMGAD S. MIKHAIL ("Plaintiff"), brings this action against Defendant THE PROCTER & GAMBLE COMPANY ("P&G" or "Defendant"), upon information and belief, respectfully allege:

## NATURE OF THE ACTION AND FACTS

    1.    This is a lawsuit regarding Defendant's manufacturing, marketing, distribution, and sale of Old Spice deodorant and antiperspirant aerosol, stick and various body spray products (the "Products") throughout the State of New York and throughout country, that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia, lymphoma and other cancers.

    2.    Old Spice is a brand of deodorants and antiperspirants manufactured, marketed, distributed, and sold by Defendant. The Old Spice Products discussed herein contain benzene, a carcinogenic chemical impurity that has been linked to leukemia, lymphoma and other cancers.

    3.    This action seeks to remedy the deceptive and misleading business practices of the Defendant with respect to the manufacturing, marketing, distribution, and sale of the Products including but limited to Old Spice – Pure Sport, Old Spice- Below Deck, Powder Spray, Feel Drier & cleaner, Down Below, Fresh Air, Old Spice- Sweat Defense, Stronger Swagger, Dry Spray, Sweat & Odor Protection, Old Spice- Sweat Defense, Ultimate Captain, Dry spray, 48 hour, Sweat & Odor Protection.

    4.    The Products are not designed to contain benzene, and in fact no amount of benzene is acceptable in antiperspirant sprays/sticks such as the Products manufactured by Defendant. The presence

of benzene in the Products renders them adulterated and misbranded, and therefore illegal to sell under both federal and state law. As a result, the Products are unsafe and illegal to sell under federal law, and therefore worthless.

5.      Defendant does specifically list both the active and inactive ingredients of the Products but fails to disclose that the products contain "benzene".

6.      Benzene is a widely recognized and incredibly dangerous substance, especially in the context of applying it to the skin. For example, benzene is known to harm the bone marrow and long exposure can lead to blood cancer, such as leukemia[1].

7.      Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals. The Department of Health and Human Services has determined that benzene causes cancer in humans. Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity." Benzene is associated with blood cancers such as leukemia and skin cancer such as lymphoma[2]. A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe,"[3] which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[4]

8.      According to the American Cancer Society:

IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that

[1] https://emergency.cdc.gov/agent/benzene/basics/facts.asp
[2] National Cancer Institute, Cancer-Causing Substances, Benzene, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.
[3] Hunter, F.T. (1939)/ chronic Exposure to Benzene (Benzol). II The Clinical Effects. *Journal Of Industrial Hygiene and Toxicology*. 1939 Vol.21 pp. 331-54, https://www.cabdirect.org/cabdirect/abstract/1940270388.
[4] Smith,Martyn T. (2010). Advances of Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health*. 2010 Vol. 31:133-148, https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[5]

9.   Moreover, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[6]

10.   According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, skin absorption, ingestion, skin and/or eye contact."[7] Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

11.   Consumers like the Plaintiff trust manufacturers such as Defendant to sell Products that are safe and free from harmful known toxins, including but not limited to benzene.

12.   Plaintiff expects that the Product he purchases will comply with its labeling and not contain any knowingly harmful substances like benzene.

13.   Defendant's marketing and advertising campaign includes the one place that every consumer look when purchasing a product – the packaging and labels themselves. Consumers expect the ingredient listing on the packaging and labels so accurately disclose the ingredients within the Products.

14.   In addition to the label, Defendant maintains a webpage containing the ingredients in the Products. Defendant specifically states within the webpage that they do not use benzene in any of their Products.[8]

15.   However, Defendant's advertising and marketing campaign is false, deceptive and

---

[5] American Cancer Society, Benzene and Cancer Risk (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html)
[6] Centers for Disease Control and Prevention, Facts about Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.
[7] National Isntitue for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npg0049.html.
[8] https://us.pg.com/ingredients/

misleading because the Products contain benzene, which Defendant does not list or mention anywhere on the Products' packaging or labeling.

16. Plaintiff relied on Defendant's misrepresentations and omissions of what is in the Products when Plaintiff purchased the Products.

17. On November 3, 2021, Valisure, an online pharmacy registered with the FDA, "detected high levels of benzene and other contaminants in specific batches of body spray products, some of which contain active pharmaceutical ingredients aluminum chlorohydrate or aluminum sesquichlorohydrate."[9]

18. Valisure tested the Products manufactured by Defendant, which were found to contain as much as 17.7 parts per million of benzene, the highest level of benzene in all of the products tested by Valisure.[10]

19. The FDA does state that if the use of benzene is "unavoidable in order to produce a drug product with a significant therapeutic advance," then the drug product may contain up to 2 ppm of benzene.[11] However, many of Defendant's Products that were tested contain levels of benzene above this amount. Regardless, according to Valisure, "[b]ecause many of the body spray products Valisure tested did not contain detectable levels of benzene, it does not appear that benzene use is unavoidable for their manufacture, and considering the long history and widespread use of these products, it also does not appear that they currently constitute a significant therapeutic advance."[12] Accordingly, any level of benzene in Defendant's Products is unacceptable and therefore renders the Products adulterated, misbranded, unsafe, and worthless.

20. Defendant did not disclose the actual or potential presence of benzene in its antiperspirant

---

[9] VALISURE, VALISURE CITIZEN PETITION ON BENZENE IN BODY SPRAY PRODUCTS, Nov.3, 2021, https://www.valisure.com/wp-content/uploads/Valisure-FDA/Citizen-Petition-on-Body-Spray-v4.0-3.pdf (the "Valisure Petition"), at 1.
[10] *Id.* At 12-14
[11] *Id.* At 1 (emphasis added.)
[12] *Id.* At 1-2.

and deodorant products on the Products' labeling, or in any advertising or website promoting the Products. Defendant did not disclose the presence of benzene in the Products to Plaintiff at the point of sale or at any time before the point of sale.

21. Antiperspirant body sprays are considered over-the-counter ("OTC") drugs that are regulated by the United States Food & Drug Administration ("FDA") pursuant to the federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 et seq., as well as analogous state statutes and regulations. Likewise, deodorants are considered cosmetics and so are also regulated by the FDA pursuant to the FDCA and analogous state statutes and regulations.

22. As OTC drug products regulated by the FDA, the Products must be both safe and effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state-law analogues. These cGMP regulations require OTC medications like the Products to meet safety, quality, purity, identity, and strength standards. See 21 U.S.C. § 51(a)(2)(B). Federal and state regulatory regimes require that labeling for OTC products. 21 C.F.R. 201.66 establishes labeling requirements for OTC products and defines an inactive ingredient as "any component other than an active ingredient."[13] An "active ingredient" is "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect." (Emphasis added).

23. 13. 21 C.F.R. § 210.1(a) states that the cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics

---

[13] https://www.fda.gov/media/72250/download.

that it purports or is represented to possess." In other words, entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.

24. Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the United States. See 21 U.S.C. §§ 331(a), 351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

25. FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

26. A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, inprocess materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160.

27. "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194.

28. Defendant disregarded the cGMPs outlined above. As a manufacturer, distributor, and seller of an OTC drug product, Defendant had and has a duty to ensure that its Products did not contain excessive (or any) levels of benzene, including through regular testing. But based on Valisure's testing results set forth above, Defendant made no reasonable effort to test its Products for benzene or other impurities. Nor did it disclose to Plaintiff or any other consumers in any product advertising, labeling, packaging, or marketing that its antiperspirant and deodorant products contained benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA. To the contrary,

Defendant represented and warranted, expressly and impliedly, that the Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens, reproductive toxins, or other impurities such as benzene.

29. If Defendant had not routinely disregarded the FDA's cGMPs, or had fulfilled their quality assurance obligations, Defendant would have identified the presence of the benzene contaminant almost immediately.

30. Further, had Defendant adequately tested its Products for benzene and other carcinogens, reproductive toxins, and impurities, it would have discovered that its Products contained benzene at levels above the FDA's limit (to the extent even applicable), making those products ineligible for distribution, marketing, and sale.

31. Accordingly, Defendant knowingly, or at least negligently, introduced contaminated, adulterated, and/or misbranded Products containing dangerous amounts of benzene into the U.S. market.

32. Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."

33. Ironically, Defendant actually touts that "[p]roduct safety is [its] top priority."[14] Defendant represents that "[a]t a minimum we ensure our products comply with applicable laws. In several areas we set our standards higher than those required by law. When this happens we also expect our suppliers and partners to meet these standards." Defendant further represents that "[b]efore we launch a product our [Safety and Environmental Assurance Centre] scientists work with teams across P&G to assess the product's safety and impact on the environment." Based on the foregoing, however, these representations are false. Defendant has not ensured compliance with applicable laws (or any "higher standards" it claims to maintain) because its failure to comply with cGMPs resulted in the contamination

---

[14] https://www.P&G.com/brands/our-products-and-ingredients/our-approach-to-the-safety-of-products-and-ingredients/.

of its Products with benzene.

34.     The presence of benzene—and Defendant's failure to comply with cGMPs— renders the Products both adulterated and misbranded under the FDCA. The Products are adulterated because they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(1).

35.     The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene. 21 U.S.C. § 352(a)(1).

36.     Under federal law, a product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

37.     When Plaintiff purchased Defendant's Products, Plaintiff did not know, and had no reason to know, that Defendant's Products were misleading, adulterated and misbranded and thus unlawful to sell or purchase as set forth herein. Not only would Plaintiff not have purchased Defendant's Products at all had he known the Products contained benzene, he would not have been capable of purchasing them if Defendant had done as the law required and tested those products for benzene and other carcinogens, reproductive toxins, and impurities.

38.     Moreover, no reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (even assuming those allowances apply to Defendant's products).

39.     Thus, if Plaintiff had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products at all, or would have paid significantly less for the Products, making such omitted facts material to them.

40. Plaintiff was injured by the full purchase price of the Products because the Products are worthless, as they are misleading, adulterated and contain harmful levels of benzene, and Defendant has failed to warn consumers of this fact. Such illegally sold products are worthless and have no value. See Debernardis v. IQ Formulations, LLC, 942 F.3d 1076, 1085 (11th Cir. 2019); see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig., 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021) ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of the dangerousness caused by their contamination, regardless whether the sold VCDs actually achieved the medical purpose of lowering blood pressure. Put differently, contaminated drugs, even if medically efficacious for their purpose, cannot create a benefit of the bargain because the contaminants, and their dangerous effects, were never bargained for.").

41. Plaintiff bargained for antiperspirant and deodorant products free of contaminants and dangerous substances, and were deprived the basis of their bargain when Defendant sold him products containing the dangerous substance benzene, which rendered the Products unmerchantable and unfit for use.

42. Plaintiff is further entitled to damages for the monies paid to purchase the Products, statutory and punitive damages, compensatory and exemplary damages, past and future medical expenses, claim for medical monitoring costs associated with testing, monitoring and remediating the effects of their benzene exposure, attorneys' fees and costs, and injunctive relief.

43. Plaintiff brings this action for relief and to recover damages and restitution for: (i) breach of express warranty; (ii) breach of implied warranty; (iii) violation of New York General Business Law ("GBL") § 349 and 350; (iv) violation of GBL § 350; (v) fraud; and (vi) unjust enrichment.

44. Defendant also breached and continues to breach its warranties regarding the Products.

## PARTIES

45. That at all the times herein mentioned the plaintiff, AMGAD S. MIKHAIL, was and still is a resident of the County of Nassau of the State of New York.

46.    Plaintiff, AMGAD S. MIKHAIL, has an intent to remain a resident of the County of Nassau of the State of New York and is therefore a domiciliary of State of New York.

47.    During the applicable statute of limitations period, Plaintiff purchased Defendant's products that contained benzene.

48.    Had the Defendant not made the false, misleading and deceptive representations and omissions regarding the Products containing benzene, Plaintiff would not have been willing to purchase the Products. Plaintiff purchased, purchased more of, and/or paid more for, the Products than he would have had he known the truth about the Products. The Products Plaintiff received were worthless because they contain the known carcinogen benzene. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

49.    Defendant The Procter & Gamble Company is an Ohio corporation with its headquarters at 1 P&G Plaza, Cincinnati, Ohio 45202. P&G distributes the Products throughout the United States and the State of New York. The Old Spice Products, including the adulterated Old Spice Products purchased by Plaintiff, are available at retail stores throughout State of New York and the United States. Defendant created and/or authorized the false, misleading, and deceptive manufacturing marketing, advertising, and distributing of the Products.

## JURISDICTIN AND VENUE

50.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because Plaintiff is a citizen of a different state than Defendant, and the amount in controversy exceeds $50,000,000 exclusive of interest and costs.

51.    This Court has personal jurisdiction over Defendant because Plaintiff purchased the Old Spice Products in this District.

52.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because in which a substantial part of the events or omissions giving rise to the claim occurred.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF NEW YORK GBL § 349

53. Plaintiff repeats and re-alleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

54. New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

55. The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff seek monetary damages against Defendant, enjoining it from inaccurately describing, labeling, marketing, and promoting the Products.

56. There is no adequate remedy at law.

57. Defendant misleadingly, inaccurately, and deceptively advertise and market their Products to consumers.

58. Defendant's improper consumer-oriented conduct—including failing to disclose that the Products have benzene—is misleading in a material way in that it, inter alia, induced Plaintiff to purchase Defendant's Products and to use the Products when they otherwise would not have. Defendant made the untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

59. Plaintiff have been injured inasmuch as they purchased products that were mislabeled, unhealthy, and entirely worthless. Accordingly, Plaintiff received less than what they bargained and paid for.

60. Defendant's advertising and Products' packaging and labeling induced Plaintiff to buy Defendant's Products.

61. Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff have been damaged thereby.

62. As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

## VIOLATION OF NEW YORK GBL § 350

63. Plaintiff repeats and re-alleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

64. N.Y. Gen. Bus. Law § 350 provides, in part, as follows: False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual …

65. Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning its Products inasmuch as they misrepresent that the Products are safe for use and don't list that the Products contain benzene.

66. Plaintiff have been injured inasmuch as they relied upon the labeling, packaging, and advertising and purchased Products that were mislabeled, unhealthy, and entirely worthless. Accordingly, Plaintiff received less than what he bargained and paid for.

67. Defendant's advertising, packaging, and Products' labeling induced Plaintiff to buy Defendant's Products.

68. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

69. Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

70. Defendant made the material misrepresentations described in this Complaint in its advertising and on the Products' packaging and labeling.

71. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

72. As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

73. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74. Defendant provided Plaintiff with an express warranty in the form of written affirmations of fact promising and representing that the Products are safe for use and do not contain benzene.

75. The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

76. These affirmations of fact became part of the basis for the bargain and were material to Plaintiff' transactions.

77. Plaintiff reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Products.

78. Defendant knowingly breached the express warranties by including benzene in the Products sold to Plaintiff and the Class without properly notifying them of their inclusion in the Products.

79. Within a reasonable time after it knew or should have known, Defendant did not change the Products' labels to include benzene in the ingredient list.

80. Defendant thereby breached the following state warranty laws:

   a. Code of Ala. § 7-2-313; b. Alaska Stat. § 45.02.313; c. A.R.S. § 47-2313; d. A.C.A. § 4-2-313; e. Cal. Comm. Code § 2313; f. Colo. Rev. Stat. § 4-2-313; g. Conn. Gen. Stat. § 42a-2-313; h. 6 Del. C. § 2-313; i. D.C. Code § 28:2-313; j. Fla. Stat. § 672.313; k. O.C.G.A. § 11-2-313; l. H.R.S. § 490:2-313; m. Idaho Code § 28-2-313; n. 810 I.L.C.S. 5/2-313; o. Ind. Code § 26-1-2-313; p. Iowa Code § 554.2313; q. K.S.A. § 84-2-313; r. K.R.S. § 355.2-313; s. 11 M.R.S. § 2-313; t. Md. Commercial Law Code Ann. § 2-313; u. 106 Mass. Gen. Laws Ann. § 2-313; v. M.C.L.S. § 440.2313; w. Minn. Stat. § 336.2-313; x. Miss. Code Ann. § 75-2-313; y. R.S. Mo. § 400.2-313; z. Mont. Code Anno. § 30-2-313; aa. Neb. Rev. Stat. § 2-313; bb. Nev. Rev. Stat. Ann. § 104.2313; cc. R.S.A.

382-A:2-313; dd. N.J. Stat. Ann. § 12A:2-313; ee. N.M. Stat. Ann. § 55-2-313; ff. N.Y. U.C.C. Law § 2-313; gg. N.C. Gen. Stat. § 25-2-313; hh. N.D. Cent. Code § 41-02-30; ii. II. O.R.C. Ann. § 1302.26; jj. 12A Okl. St. § 2-313; kk. Or. Rev. Stat. § 72-3130; ll. 13 Pa. Rev. Stat. § 72-3130; mm. R.I. Gen. Laws § 6A-2-313; nn. S.C. Code Ann. § 36-2-313; oo. S.D. Codified Laws, § 57A-2-313; pp. Tenn. Code Ann. § 47-2-313; qq. Tex. Bus. & Com. Code § 2.313; rr. Utah Code Ann. § 70A-2-313; ss. 9A V.S.A. § 2-313; tt. Va. Code Ann. § 59.1-504.2; uu. Wash. Rev. Code Ann. § 6A.2-313; vv. W. Va. Code § 46-2-313; ww. Wis. Stat. § 402.313; xx. Wyo. Stat. § 34.1-2-313.

81. As a direct and proximate result of Defendant's breach of the express warranties, Plaintiff were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

82. Plaintiff brings this count on behalf of himself and the Class and repeats and re-alleges all previous paragraphs, as if fully included herein.

83. Defendant sold and Plaintiff purchased the Products.

84. When sold by Defendant, the Products were not merchantable, did not pass without objection in the trade under the label description, were not of adequate quality within that description, were not fit for the ordinary purposes for which such goods are used, and did not conform to the promises or affirmations of fact made on their container or label.

85. Because the Products contain benzene, they in no way were safe for use as body spray products.

86. As a direct result of Defendant's products being unfit for its intended purpose and/or otherwise not merchantable, Plaintiff were damaged because they would not have

purchased Defendant's Products had they known the true facts regarding the benzene content.

87. As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff have been injured and harmed because: (a) he would not have purchased the Products on the same terms if they knew that the Products contained harmful levels of benzene and are not generally recognized as safe for human use; and (b) the Products do not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

88. As a direct result of Plaintiff' exposure to benzene, Plaintiff has serious medical complication such as including but not limited to lymphoma and have a significantly increased risk of serious medical complications, including ailments such as bone marrow harm and blood cancer (such as leukemia).

## FIFTH CAUSE OF ACTION

## FRAUDULENT CONCEALMENT

89. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90. Defendant concealed and failed to disclose on the Product's packaging and labeling that the material fact the Products contained benzene, and that the Products were not safe or healthy for use.

91. Defendant had knowledge that the Products contained benzene, and that the Products were not safe or healthy for use.

92. Defendant has a duty to disclose that the Products contained benzene, and that the Products were not safe or healthy for use.

93. Defendant had superior knowledge or means of knowledge available to it and knew that Plaintiff would rely upon the representations and omissions of Defendant regarding the quality and ingredients of its Products. Consumers lack the meaningful ability to test or

independently ascertain or verify whether a product contains benzene, especially at the point of sale.

94. Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiff and the Class Members are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the products they buy. Defendant knows that if it had not omitted that the Products contained benzene, then Plaintiff and the Class would not have purchased the Products at all; however, Defendant wanted to increase sales and profits. Defendant's concealment misled Plaintiff and the Class as to the true nature of what they were buying and putting onto and into their bodies.

95. Defendant fraudulently concealed that the Products contained benzene and that the Products were not safe or healthy for use. Consequently, Plaintiff and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

## INJUCTIVE RELIEF FOR MEDICAL MONITORING

96. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97. As a result of Defendant's negligence, Plaintiff have been subjected to exposure to the carcinogen benzene.

98. As a proximate result of Plaintiff' exposure to benzene, Plaintiff has serious medical complication such as including but not limited to lymphoma and have a significantly increased risk of serious medical complications, including ailments such as bone marrow harm and blood cancer (such as leukemia).

99. A monitoring procedure exists that makes the early detection of these types of ailments possible.

100. The prescribed monitoring program is reasonably necessary according to contemporary scientific principles.

101. Defendant's acts were willful, wanton, or reckless and conducted with a reckless indifference to the health and rights of Plaintiff.

102. Plaintiff seeks injunctive relief against Defendant that has acted or refused to act in a prudent manner (i.e., Defendant has marketed its Products using the same misleading and deceptive labeling to all of the Class Members).

103. Plaintiff seeks to include an injunction to require the implementation and funding of a blood serum testing program for the Plaintiff to test for the presence of benzene in his blood serum; and the implementation and funding of a medical monitoring program for Plaintiff sufficient to monitor Plaintiff's health to ensure he is adequately monitored for the harmful effects of benzene in the human body.

104. Any final injunctive relief or declaratory relief would benefit Plaintiff and community in whole as Defendant would be prevented from continuing their misleading and deceptive marketing practices and would be required to honestly disclose to consumers the true nature of the contents of the Products

## SEVENTH CAUSE OF ACTION

## UNJUST ENRICHMENT

105. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

106. Plaintiff, on behalf of himself and consumers nationwide, brings a claim for unjust enrichment.

107. Defendant's conduct violated, inter alia, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

108. Defendant's unlawful conduct, as described in this Complaint, allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiff and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

109. Plaintiff conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

110. It is inequitable for Defendant to retain the benefits conferred by Plaintiff' overpayments.

111. Plaintiff seek establishment of a constructive trust from which Plaintiff may seek restitution.

## EIGHTH CAUSE OF ACTION

### FRAUD

112. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113. Defendant made fraudulent misrepresentations to Plaintiff regarding the Products, specifically that the Products contained only the active and inactive ingredients stated on the label, and not harmful impurities such as benzene. Defendant also materially omitted facts from Plaintiff, including that the Products in fact contained harmful levels of benzene.

114. Defendant had a duty to disclose material facts to Plaintiff given its relationship as contracting parties and intended users of the Products. Defendant also had a duty to disclose material facts to Plaintiff, namely that it was in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendant had superior

knowledge such that the transactions without the disclosure were rendered inherently unfair.

115. Defendant knew or should have known that the Products were contaminated with benzene, but continued to manufacture them nonetheless. Defendant was required to engage in impurity testing to ensure that harmful impurities such as benzene were not present in the Products. Had Defendant undertaken proper testing measures, it would have been aware that the Products contained dangerously high levels of benzene. During this time, Plaintiff and members of the Classes were using the Products without knowing it contained dangerous levels of benzene.

116. Defendant failed to discharge its duty to disclose these material facts.

117. In so failing to disclose these material facts to Plaintiff, Defendant intended to hide from Plaintiff that they were purchasing and using the Products with harmful defects that were unfit for human use, and thus acted with scienter and/or an intent to defraud.

118. Plaintiff reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the defective Products manufactured and sold by Defendant had they known they contained unsafe levels of benzene. As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiff suffered damages in the amount of monies paid for the defective Products.

119. As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

120. JURY DEMAND Plaintiff demands a trial by jury on all issues.

121. WHEREFORE, Plaintiff prays for judgment as follows:

(1) Entering preliminary and permanent injunctive relief against Defendant, directing Defendant to correct its practices and to comply with consumer protection statutes nationwide, including New York consumer protection laws; (2) An Order requiring

Defendant to establish a blood testing program for Plaintiff, as well as to establish a medical monitoring protocol for Plaintiff to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to benzene; (3) Awarding monetary damages and treble damages in the amount of more than $50, 000, 000; (4) Awarding statutory damages of $50 per transaction, and treble damages for knowing and willful violations, pursuant to N.Y. GBL § 349; (5) Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL § 350; (6) Awarding punitive damages; (7) Awarding Plaintiff their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, experts, and reimbursement of Plaintiff's expenses, past and future medical expense and personal injury; and (8) Granting such other and further relief as the Court may deem just and proper

Dated: Elmhurst, NY

June 17, 2022

Yours, etc.

GAMBONE LAW GROUP, PLLC

By: Adilya Gambone, Esq.
Attorney(s) for Plaintiff(s)
AMGAD S. MIKHAIL
9131 QUEENS BLVD, SUITE 318
ELMHURST, NY 11373
T: 718 650 5111
F: 718 682 3155
agambone@gambonelawgroup.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

AMGAD S. MIKHAIL,

Plaintiff (s),

-against-

THE PROCTER & GAMBLE COMPANY,

Defendant (s),

-------------------------------------------------------------------------X

## COMPLAINT

# GAMBONE LAW GROUP, PLLC

Attorneys for Plaintiff

*Office and Post Office Address, Telephone*

9131 QUEENS BLVD, SUITE 318

ELMHURST, NY 11373

TELEPHONE (718) 650-5111

**"WE DO NOT ACCEPT SERVICE BY ELECTRONIC TRANSMISSION (FAX)"**

*Attorney(s) for*

*Service of a copy of the within*        *is hereby admitted*
*Dated:,*

...............................................
*Attorney(s) for*

GAMBONE LAW GROUP, PLLC
Attorney for Plaintiff